**Hearing Date:  July 11, 2007 at 9:45 a.m.**
**Objections Due:  June 15, 2007 at 4:00 p.m.**
**Reply Date:  June 29, 2007 at 4:00 p.m.**

Carole Neville (CN 5733)
Arthur H. Ruegger (AR 8329)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020-1089
Tel:  (212) 768-6700
Fax:  (212) 768-6800

*Attorneys for the Sonnenschein Defendants*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| | Case No.: 06-22306 (ASH) |
| BAYOU GROUP, LLC, <u>et</u> <u>al.</u>, | (Jointly Administered) |
| Debtors. | |
| —————————————————— | |
| BAYOU ACCREDITED FUND, LLC, | Adv. Proc. No.  06-08318 (ASH) |
| Plaintiff, | |
| -against- | |
| REDWOOD GROWTH PARTNERS, L.P., | |
| Defendant. | |
| —————————————————— | |
| Additional Adversary Proceeding Captions Listed on Schedule A hereto. | |

**SONNENSCHEIN DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT ON THE AMENDED COMPLAINTS PURSUANT
TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE,
FEDERAL RULE OF BANKRUPTCY
<u>PROCEDURE 7056 AND LOCAL BANKRUPTCY RULE 7056-1</u>**

# TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................................... iii

INTRODUCTION ................................................................................................................ 2

STATEMENT OF FACTS ................................................................................................... 3

ARGUMENT ....................................................................................................................... 6

STANDARDS FOR SUMMARY JUDGMENT .................................................................. 7

POINT I
FRAUDULENT TRANSFER CLAIMS CAN ONLY BE
BROUGHT FOR THE BENEFIT OF CREDITORS -- NOT EQUITY
HOLDERS --  AND ONLY TO THE EXTENT NECESSARY
TO SATISFY SUCH CREDITORS ...................................................................................... 8

   A.   Fraudulent Transfer Claims Can Only Be Brought
       For the Benefit of Creditors ................................................................................. 8

   B.   Fraudulent Transfer Claims Can Only Be Brought To the
       Extent Necessary To Satisfy Creditors' Claims ................................................. 12

POINT II
THE NON-REDEEMING INVESTORS IN THE BAYOU
FUNDS DO NOT QUALIFY AS CREDITORS ELIGIBLE TO
SUPPORT THE DEBTORS' FRAUDULENT TRANSFER CLAIMS .................................... 13

   A.   As LLC Members Under the Delaware Law,
       Bayou Investors Were Equity Holders .............................................................. 14

   B.   Under the Controlling Agreements
       Investors in The Bayou Funds Were Equity Holders ......................................... 17

   C.   The Relevant Precedent Compels The Conclusion That Investors'
       Membership Status Is Equivalent to Corporate Shareholders .......................... 20

POINT III.
ALL CLAIMS BY BAYOU INVESTORS TO RECOVER
FOR LOSSES IN THEIR INVESTMENTS MUST BE TREATED
AS EQUAL OR SUBORDINATE TO EQUITY INTERESTS
PURSUANT TO 11 U.S.C. § 510(b), AND

CANNOT SUPPORT FRAUDULENT TRANSFER CLAIMS ................................................. 21

    A.   The Purpose of Section 510(b) ......................................................................... 22

    B.   Irrelevance of the Legal Theory or Time of Misconduct.................................. 24

    C.   Investment Intermediaries' Losses .................................................................. 27

    D.   Subordination Here Requires Dismissal of the Debtors' Cases........................ 28

CONCLUSION................................................................................................................... 30

# TABLE OF AUTHORITIES

**CASES**

*A/S Kreditt-Finans v. Cia Venetico de Navegacion S.A.,*
   560 F. Supp. 705 (E.D. Pa. 1983), *aff'd,* 729 F.2d 1446 (3d Cir. 1984) .................................. 12

*Addy v. Myers,* 616 N.W.2d 359 (N.D. 2000) ............................................................... 15

*Allied Capital Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020 (Del. Ch. 2006) ........................ 20

*In re Alta+Cast, LLC*, 301 B.R. 150 (Bankr. D. Del. 2003) ............................................... 22

*American Broad Sys. v. Nugent (In re Betacom of Phoenix)*,
   240 F.3d 823 (9th Cir. 2001) ............................................................................ 27

*Anchorage Police & Fire Ret. Sys. v. Official Committee of Holding
   Company Debtors (In re Conseco, Inc.),* 2004 WL 1459270, 2004 U.S. Dist.
   LEXIS 11734 (N.D. Ill. June 25, 2004) ................................................................... 25

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................... 7

*Balaber-Strauss v. Murphy (In re Murphy),*
   331 B.R. 107 (Bankr. S.D.N.Y. 2005) ........................................................... 8, 10, 11, 12

*Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.),*
   281 F.3d 133 (3d Cir. 2002) ...................................................................... 22, 23, 24, 25

*In re Best Products Co.,*
   168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd,* 68 F.3d 26 (2d Cir. 1995) ...................... 8, 9, 11

*In re Bicoastal Corp.,* 133 B.R. 252 (Bankr. M.D. Fla. 1991) ........................................... 29

*Brown v. General Electric Capital Corp. (In re Foxmeyer Corp.),*
   296 B.R. 327 (Bankr. D. Del. 2003) ....................................................................... 6

*Buckley Petroleum Products, Inc. v. Goldman,*
   28 A.D.2d 640, 280 N.Y.S.2d 876 (4th Dep't 1967) ..................................................... 12

*Buncher Co. v. Official Committee of Unsecured Creditors of
   GenFarm Ltd. Partner'p IV,* 229 F.3d 245 (3d Cir. 2000) ........................................... 9, 10

*Carrieri v. Jobs.Com Inc.*, 393 F.3d 508 (5th Cir. 2004) ............................................... 28

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .......................................................... 7

*In re Cincinnati Microwave Inc.*, 210 B.R. 130 (Bankr. S.D. Ohio 1997) ............................... 30

*Dunes Hotel Assocs. v. Hyatt Corp.,* 245 B.R. 492 (D. S.C. 2000) .......................................... 9, 11

*In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006) ................................................ 22, 24, 25

*In re Enron Corp.*, 352 B.R. 363 (Bankr. S.D.N.Y. 2006) ........................................................... 28

*F.D.I.C. v. American Bank Trust Shares, Inc.,* 412 F. Supp. 302 (D. S.C. 1976),
    *vacated on other grounds,* 558 F.2d 711 (4th Cir. 1977) ......................................................... 23

*First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253 (1968) ................................. 8

*In re Geneva Steel Co.*, 281 F.3d 1173 (10th Cir. 2002) ........................................................ 24, 28

*In re Granite Partners, L.P.,* 208 B.R. 332 (Bankr. S.D.N.Y. 1997) ........................................... 23

*Great Lakes Chemical Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376 (D. Del. 2000) ................... 15

*Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broadcasting Corp.,*
    906 A.2d 218 (Del. Ch. 2006) ................................................................................ 12, 14, 20

*In re International Wireless Communications Holdings, Inc.*,
    257 B.R. 739 (Bankr. D. Del. 2001), *aff'd,* 279 B.R. 463 (D. Del. 2002),
    *aff'd,* 68 Fed. Appx. 275 (3d Cir. April 16, 2003) .................................................................... 26

*J.E. Jennings, Inc. v. William Carter Co. (In re J.E. Jennings, Inc.),*
    46 B.R. 167 (Bankr. E.D. Pa. 1985) .......................................................................................... 8

*In re Jacom Computer Services, Inc.*, 280 B.R. 570 (Bankr. S.D.N.Y. 2002) ............................ 27

*Jezarian v. Raichle (In re Stirling Homex Corp.),*  579 F.2d 206 (2d Cir. 1978) ............. 14, 16, 23

*Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.),*
    103 B.R. 610 (Bankr. E.D. Pa.), *aff'd,* 121 B.R. 442 (E.D. Pa. 1989) ........................ 14, 16, 20

*Kennedy Inn Assocs. v. Perab Realty Corp. (In re Kennedy Inn Assocs.),*
    221 B.R. 704 (Bankr. S.D.N.Y. 1998) ................................................................................. 9, 11

*L'Arbalete, Inc. v. Zaczac,* 474 F. Supp. 2d 1314 (S.D. Fla. 2007) ...................................... 16, 20

*Levine v. R.T.C. (In re Coronet Capital Co.)*, 1995 WL 429494, 1995 U.S. Dist.
    LEXIS 10175 (S.D.N.Y. July 20, 1995) ................................................................................. 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) .................................... 7

*McFarland v. Leyh (In re Texas Gen. Petroleum Corp.),*
    52 F.3d 1330 (5th Cir. 1995) ................................................................................................. 10

*In re Mercury Finance Co.*, 240 B.R. 270 (N.D. Ill. 1999) ........................................................ 30

*In re Mid-American Waste Systems, Inc.*, 228 B.R. 816 (Bankr. D. Del. 1999) .......................... 27

*Mills v. Webster (In re Multimedia Communications Group Wireless Assocs.*
*of Liberty County, Ga., L.C.),* 212 B.R. 1006 (Bankr. M.D. Fla. 1997) ........................ 6, 17, 20

*Moore v. Bay (In re Sassard & Kimball, Inc.),* 284 U.S. 4 (1931) .......................................... 9, 12

*Newfield v. Ettlinger,* 22 Misc. 2d 769, 194 N.Y.S.2d 670 (Sup.Ct. N.Y. County 1959),
*app. dismissed,* 10 A.D.2d 947, 205 N.Y.S.2d 908 (1st Dep't 1960) ........................................ 10

*Newton Nat'l Bank v. Newbegin*, 74 F. 135 (8th Cir. 1896) ......................................................... 23

*Official Committee of Creditors Holding Unsecured Claims v. PaineWebber, Inc.*
*(In re De Laurentiis Entertainment Group, Inc.),* 124 B.R. 305 (C.D. Cal. 1991) ................. 27

*Pippin v. Kaiser Group Int'l, Inc. (In re Kaiser Group Int'l, Inc.),* 2001 WL 34368405,
2004 U.S. Dist. LEXIS 25574 at *4 (D. Del. November 29, 2001) ........................................ 25

*Prudential Savings Bank v. Grant,* 99 N.Y.S.2d 602 (Sup.Ct., N.Y. County 1950) ............. 10, 11

*In re Revco D.S., Inc.,* 118 B.R. 468 (Bankr. N.D. Ohio 1990) ................................. 11, 14, 20, 29

*Rodriguez v. Citibank, F.S.B. (In re Nowicki),*
202 B.R. 729 (Bankr. N.D. Ill. 1996) ................................................................................... 12

*Rombro v. Dufrayne (In re Medical Diversified, Inc.)*, 461 F.3d 251 (2d Cir. 2006) ........... 24, 25

*Sender v. Johnson (In re Hedged-Investments Assocs., Inc.),*
84 F.3d 1267 (10th Cir. 1996) ............................................................................................. 14, 20

*Shakelford v. Metricom, Inc.,* 2006 WL 2724149, (N.D. Cal. Sept. 22, 2006) .......................... 28

*The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*
*(In re Cybergenics Corp.),* 226 F.3d 237 (3d Cir. 2000) ........................................................ 10

*Travelers Ins. Co. v. 633 Third Associates,* 973 F.2d 82 (2d Cir. 1992) ..................................... 12

*Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero Corp.),*
735 F.2d 740, 742 (2d Cir. 1984) ........................................................................................... 11

*Vista Eyecare, Inc. v. Neumann (In re Vista Eyecare, Inc.*),
283 B.R. 613 (Bankr. N.D. Ga. 2002) ................................................................................... 25

*Washington Bancorporation v. F.D.I.C. (In re Washington Bancorporation*),
1996 WL 148533, 1996 U.S.Dist. LEXIS 3876 (D. D.C. March 19, 1996) ........................... 22

*In re Walnut Equipment Leasing Co.*, 1999 WL 1271762,
1999 Bankr. LEXIS 1626 (Bankr. E.D. Pa. Dec. 28, 1999) ............................................. 27, 28

*Weissmann v. Pre-Press Graphics, Co. (In re Pre-Press Graphics Co.),*
307 B.R. 65 (N.D. Ill 2004) ............................................................................................... 24, 26

*Wellman v. Wellman,* 933 F.2d 215 (4th Cir. 1991) ............................................................ 8, 9, 11

*Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582 (2d Cir. 1950) ............................... 8, 11

*Wilcox v. Goess,* 22 F. Supp. 841 (S.D.N.Y. 1938) .................................................................. 9-10

*In re WorldCom Inc.,* 329 B.R. 10 (Bankr. S.D.N.Y. 2005) ................................................ 24, 26, 28

## STATUTES AND RULES

11 U.S.C. § 101(49) ................................................................................................................... 22

11 U.S.C. § 105(a) ....................................................................................................................... 6

11 U.S.C. § 502(d) ....................................................................................................................... 6

11 U.S.C. § 510(b) ............................................................................................................... passim

11 U.S.C. § 544 .................................................................................................................... passim

11 U.S.C. § 548 .................................................................................................................... passim

11 U.S.C. § 550 .................................................................................................................... 6, 8, 9

11 U.S.C. § 551 ............................................................................................................................ 6

11 U.S.C. § 1107 .......................................................................................................................... 6

Delaware Gen. Corp. Law, Code title 8 ...................................................................................... 15

Delaware Limited Liability Company Act,
    title 6, chapter 18, §§ 18-101 - 1109 ............................................................................. *passim*

Delaware Limited Partnership Law, Code title 6, chapter 17, §§ 17-101 - 1111 .................. 16, 19

New York Debtor and Creditor Law §§ 273-276a, 278 ......................................................... 6, 10

## MISCELLANEOUS

1 G. Glenn, *Fraudulent Conveyances and Preferences* (1940) ..................................................... 11

Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy --
    Allocating the Risk of Illegal Securities Issuance Between Security Holders
    and the Issuer's Creditors, 48 N.Y.U.L.Rev. 261, 286-87 (1973) ...................................... 14, 23

Carole Neville (CN 5733)
Arthur H. Ruegger (AR 8329)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020-1089
Tel:  (212) 768-6700
Fax:  (212) 768-6800

*Attorneys for the Sonnenschein Defendants*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| | Case No.: 06-22306 (ASH) |
| BAYOU GROUP, LLC, <u>et</u> <u>al</u>., | (Jointly Administered) |
| Debtors. | |
| BAYOU ACCREDITED FUND, LLC, | Adv. Proc. No.  06-08318 (ASH) |
| Plaintiff, | |
| -against- | |
| REDWOOD GROWTH PARTNERS, L.P., | |
| Defendant. | |
| Additional Adversary Proceeding Captions Listed on Schedule A hereto. | |

**SONNENSCHEIN DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT ON THE AMENDED COMPLAINTS PURSUANT
TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE,
FEDERAL RULE OF BANKRUPTCY
<u>PROCEDURE 7056 AND LOCAL BANKRUPTCY RULE 7056-1</u>**

The investor defendants listed on the attached Schedule A, through their attorneys

Sonnenschein Nath & Rosenthal LLP (the "Sonnenschein Defendants"), hereby file this

memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure, Federal Rule of Bankruptcy Procedure 7056 and Local

Bankruptcy Rule 7056-1 for an order dismissing the respective adversary proceedings.  In

support of their motion, the Sonnenschein Defendants respectfully state as follows:

## <u>INTRODUCTION</u>

The Sonnenschein Defendants move for summary judgment dismissing the adversary

proceedings on the grounds that fraudulent conveyance actions may only be pursued on behalf of

creditors, and there are no true creditors of the Bayou hedge funds.  The sole potential

beneficiaries of these adversary proceedings are equity investors in the hedge funds who, in

executing the agreements governing their investments, agreed, among other things, that (1) the

hedge funds could prefer one investor over another with respect to withdrawals; and (2) as

investors, they would not pursue other investors for a shortfall in their accounts.  The bankruptcy

filings were apparently orchestrated by large fund investors in Bayou to circumvent these and

other legal impediments to a recovery from redeeming investors[1] and to use a debtor's avoidance

powers--remedies designed to bring assets into an estate for creditors--to create a recovery for

the remaining Bayou fund equity holders from the former equity holders.  In this regard, the

adversary proceedings represent a misuse of sections 544 and 548 of the Bankruptcy Code.

The fact that the investors were defrauded and, consequently had the right to seek

rescission or damages from the hedge funds prior to the filing of the bankruptcy cases does not

save the adversary proceedings.  Once the bankruptcy cases were filed, all "claims" (tort or

contract) related to the equity investments became subject to mandatory subordination under

section 510(b) and must be treated as equity for purposes of distributions and all purposes related

thereto, including the prosecution of litigation to permit a distribution to equity holders.  Section

---

[1]    These large fund investors continue to influence the cases as members of the Official Committee of
Unsecured Creditors.  At least one of these funds (the Bermuda Fund), redeemed $8 million of its $13 million
investment between February 2003 and April 2005, yet has not been pursued for return of any of its redemption
payments in three rounds of adversary proceedings brought by the Debtors.

510(b) was enacted, among other things, to prevent an equity holder from "bootstrapping" its

equity interest to a general unsecured creditor status simply by alleging fraud, rescission or some

other theory related to the purchase, sale or retention of the security.  Thus, to allow the equity

holders in these cases to create a recovery for themselves through creditor litigation would

undermine not only the uniform precedent but also the very purpose and intent of section 510(b)

as well as sections 544 and 548.

   For these reasons, as more fully discussed below, the Sonnenschein Defendants seek

dismissal of the adversary proceedings in their entirety with prejudice.

## STATEMENT OF FACTS

   The facts underlying this motion are simple and irrefutable.  As evidenced by the proofs

of claim filed in these cases, the Bayou hedge funds paid their creditors.  Except for claims filed

by three investment intermediaries arising from the fraud on the investors and misfiled claims by

a single employee/equity investor of Bayou Securities LLC, the "creditors" on whose behalf the

fraudulent conveyance actions were brought are, as a matter of law, equity holders in the funds.

Their status as equity holders deprives the Debtors of standing and the authority to sue under

state or federal fraudulent conveyance statutes.

   There were 1082 proofs of claim docketed on the claims register maintained by the

Trumbull Group for all of the Bayou Debtors as of April 17, 2007.  *See* Declaration of Carole

Neville dated May 15, 2007 ("Neville Dec.") ¶ 3.  After eliminating duplicate claims filed

against multiple debtors, only **four** claimants that were **not** equity investors in one of the

domestic hedge funds (Bayou Superfund, LLC, Bayou No Leverage Fund, LLC, Bayou

Accredited Fund, LLC, Bayou Affiliates Fund, LLC and, in certain cases, the original hedge

fund, Bayou Fund, LLC, collectively, the "Bayou Hedge Funds") filed proofs of claim against

those debtors.[2] (Neville Dec.¶¶ 4, 8).  These claimants do not qualify as creditors for standing

purposes in the adversary proceedings.  Two of the claims, totaling $432,024.00, were filed by a

former employee of and investor in Bayou Securities LLC, Paul Archinard, for severance and on

account of his equity investment (the "Archinard Claims"). (Neville Dec.¶¶ 8(D) and 8(E)).  The

Archinard Claims are more properly asserted against Bayou Securities, the broker/dealer entity

of the Bayou Group, not the Bayou Hedge Funds. (Neville Dec.¶ 14).  In addition, the larger of

the Archinard Claim in the amount of $377,000 relates to a 1999 agreement between Archinard

and Bayou Securities for the purchase a 2% interest in Bayou Securities. (Neville Dec.¶ 14).

This "claim", therefore, is or will be reclassified and treated as an equity interest.  The Archinard

Claims are listed as disputed on the Debtors' schedules and should be disallowed in their entirety

based on information the Debtors have about the claims. (Neville Dec.¶ 13)

The remaining three claims filed against the Bayou Hedge Funds were filed by the

investment advisors to certain redeeming investors in unliquidated or partially liquidated

amounts for damages and costs relating to the Bayou fraud. (Neville Dec.¶ 8)  The investment

advisor claims are subject to subordination under section 510(b) of the Bankruptcy Code, as

discussed below.  If these few "claims" against the hedge funds are reclassified, subordinated,

---

[2]      Although not relevant to this motion, the Court should be aware that there were other proofs of claim filed
against non-Hedge-Fund debtors (totaling less than $300,000 of timely filed claims) and claims filed by offshore
fund investors.
         First, there were a few additional proofs of claim against one or more of the Debtors other than the Bayou
Hedge Funds filed by individuals or entities that were not investors in one of the Funds.  The aggregate stated
amount of these timely filed claims is a mere $266,656.11.  These non-investor claims against other Debtors are:
one claim filed by Checkers International Inc., an investigatory service, in the amount of $20,653.78; three claims in
the amount of $733.00 filed by the Connecticut Department of Revenue Service; one claim filed by the Connecticut
Department of Revenue Service for $849.33; another filed by the Connecticut Department of Revenue Service for
$1,503.00; a claim in an unliquidated amount filed by the Commodity Futures Trading Commission for restitution;
and a claim in the amount of $241,451.00 filed by the Hennessee Group, an investment advisor to non-redeeming
investors.  On March 30, 2007, after the bar date, Marcus Marino Architects filed a claim against the Bayou Group
LLC for services performed in the amount of $86,625. (Neville Dec. ¶ 22).
         There are also a number of duplicate claims docketed on the Claims Register that were filed either by the
liquidators for the offshore hedge funds, that are the subject of a proceeding in the Cayman Islands on behalf of the
investors in those funds, or by the offshore fund investors themselves for return of their investments.  None of these
claims against other Debtors or relating to the offshore investment alter the fundamental fact that the adversary
proceedings have been brought improperly by the Bayou Hedge Fund Debtors on behalf of their equity holders.
(Neville Dec. ¶¶ 24-26).

settled or disallowed, there will be no creditor claims against the plaintiffs who commenced the adversary proceedings.

This leaves only claims filed by equity investors. After eliminating obvious duplicate claims filed against multiple Debtors, there are approximately 200 proofs of claim filed by equity investors in one or more of the Bayou Hedge Funds based on their investments alone or for fraud in connection with the purchase or retention of those investments.[3] (Neville Dec.¶ 16) The proofs of claim were filed either in the amount of the investment in one of the Bayou Hedge Funds or in the amount of the closing balance of the capital account as reported by Bayou -- that is, in the amount of principal plus profits. (Neville Dec.¶ 17) All of the claims stem from and relate to the acquisition of membership interests in one or another of the four hedge funds operated as limited liability companies. (Neville Dec.¶¶ 28-32) The membership interests, as discussed below, are equity interests.

Although these investors are identified as creditors in the Amended Complaints and, as everyone concedes, they had the right prior to the filing of the petitions to pursue claims for damages or rescission against the Bayou Hedge Funds,[4] their claims in the bankruptcy cases are subject to mandatory subordination pursuant to section 510(b) and are treated as equity.

---

[3]       Although the Ponzi scheme allegations in the Amended Complaints are not germane to this Motion, contrary to such allegations and based upon the dates the investors contributed to the Bayou Hedge Funds and the dates of redemption, the Bayou Hedge Funds did not use the funds of later investors to meet the redemption demands of early investors. To the extent it can be determined by the proofs of claim, the investors remaining in the funds when the cases were filed contributed capital to the funds contemporaneously with the redeeming investors, and there is no pattern to redemptions based on time of investment. (Neville Dec. ¶ 21). There were only approximately 32 new investors in 2005 in the Bayou Hedge Funds with investments totaling less than $31,000,000 (Neville Dec. ¶ 21). In other words, the Bayou Hedge Funds did not utilize after-acquired investment funds to pay off previous investors.
          The proofs of claim also demonstrate that the investors are not divided neatly into two groups as they have been discussed to date: those that redeemed and those that did not. There are investors that (1) redeemed in part, (2) also filed proofs of claim, and (3) have not been sued by the Debtors for return of their redemption payments, including one member of the Official Committee of Unsecured Creditors that redeemed $8,000,000 of a $13,000,000 investment over time. (Neville Dec. ¶ 20). There are redeeming investors that only received portions of their investment that were sued by the Debtors. Working an equitable result for the investors, then, is not simply a matter of taking from the defendants in the adversary proceedings and turning the recovery over to the investors who filed claims.

[4]       As discussed below, the remaining investors had no right to pursue the redeeming members for a shortfall in their capital accounts under the circumstances of these cases and the terms of the Operating Agreements.

Whether as equity holders or claimants with claims on par with equity, the investors are not the proper beneficiaries of fraudulent conveyance suits under section 548 of the Bankruptcy Code and do not qualify as creditors to confer standing on the Debtors under section 544.

## ARGUMENT

The Amended Complaints seek under the authority of 11 U.S.C. §§ 105(a), 502(d), 544(b), 548(a), 550(a), 551 and 1107 of Title 11 of the United States Code (the "Bankruptcy Code") and §§ 273, 274, 275, 276, 276-a and 278 of New York's Debtor and Creditor Law (the "DCL") to avoid and recover alleged fraudulent transfers "so that the funds can be equitably redistributed pro-rata to all of the Bayou Entities' creditors" (Amended Complaint ¶¶ 2, 3).[5] The Amended Complaints also make clear that the term "creditors" as used therein refers to the non-redeeming investors (*see, e.g.,* Amended Complaint ¶ 23: "the Bayou Entities' creditors lost approximately $250 million"), and, if successful, plaintiff Debtors claimed in the Amended Complaint that they intended to distribute proceeds ratably.

However, the course of action pursued by the Debtors is a misuse of a debtor's avoidance powers under the Bankruptcy Code and New York's DCL. As shown below in Point I, fraudulent transfer claims may only be brought for the benefit of creditors. As shown in Point II, the Bayou investors are -- in every relevant context -- equity holders, or claimants on a par with equity holders. Bayou investors are not creditors, and thus, the Debtors cannot use state or federal fraudulent conveyance statutes to create recoveries for such investors. As shown below in Point III, under Section 510(b) of the Bankruptcy Code, any claims of the non-redeeming investors for recovery of any aspect of investment loss must be treated on a par with investors'

---

[5]     The term "Bayou Entities", as defined in the Amended Complaint ¶1, includes both the five Bayou Hedge Funds and four co-debtors, specifically:  Bayou Group, LLC, Bayou Management, LLC, Bayou Advisors, LLC and Bayou Equities, LLC.  Of course, only creditors of the particular plaintiff fund can share in any recovery of that fund's avoided transfers, *Brown v. General Electric Capital Corp. (In re Foxmeyer Corp.),* 296 B.R. 327, 335 (Bankr. D. Del. 2003); *Mills v. Webster (In re Multimedia Communications Group Wireless Assocs. of Liberty County, Ga., L.C.),* 212 B.R. 1006, 1010-11 (Bankr. M.D. Fla. 1997).

equity interests.  These claims cannot be used to bootstrap the equity interests to creditor claim

status for the purpose of  qualifying the investors as the beneficiaries of the Debtors' fraudulent

transfer actions.

There is no dispute with respect to the material facts; there are no creditors on whose

behalf the adversary proceeding may be properly prosecuted.  The Debtors filed these

bankruptcy cases solely for the purpose of suing the former equity holders of the Bayou Hedge

Funds for the benefit of the remaining equity holders.  As a matter of law, summary judgment

should be granted dismissing all claims in these adversary proceedings in their entirety and with

prejudice.

## STANDARDS FOR SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56, as made applicable by Bankruptcy Rule 7056, a defendant may

move at any time for full or partial summary judgment, which should be granted if defendant

shows:

> that there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law.  A
> summary judgment, interlocutory in character, may be rendered on
> the issue of liability alone although there is a genuine issue as to
> the amount of damages.

Rule 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  While the initial burden of

demonstrating the absence of a material factual dispute rests with the movant, once met the

burden then shifts to the non-moving party to present "significant probative supporting evidence"

that a factual dispute exists.  *Anderson v. Liberty Lobby, Inc.,*  477 U.S. 242, 249 (1986).  A

factual dispute can only arise if the issue is both "genuine" and "material".  To show a "genuine"

issue of fact, the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

475 U.S. 574, 586 (1986).  Similarly,  factual issues are only "material" if they "might affect the

outcome of the suit under the governing law," *Anderson,* 477 U.S. at 248.  "Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no 'genuine issue for trial,'" *Matsushita,* 475 U.S. at 587, quoting *First National Bank of Arizona*

*v. Cities Service Co.,* 391 U.S. 253 (1968).

### POINT I.

### FRAUDULENT TRANSFER CLAIMS CAN ONLY BE BROUGHT FOR THE BENEFIT OF CREDITORS -- NOT EQUITY HOLDERS -- AND ONLY TO THE EXTENT NECESSARY TO SATISFY SUCH CREDITORS

> A.      Fraudulent Transfer Claims Can Only
>         Be Brought For the Benefit of Creditors

"The purpose of fraudulent conveyance law, whether state or federal, and of Section 548

is to prevent harm to creditors by a transfer of property from the debtor." *Balaber-Strauss v.*

*Murphy (In re Murphy),* 331 B.R. 107, 124 (Bankr. S.D.N.Y. 2005) (under §§ 548(a)(1)(B) and

550 trustee's fraudulent transfer claims allowed only to extent necessary to satisfy allowed

claims); *see also Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582, 584 (2d Cir. 1950)

(no lien avoidance without benefit to creditors); *In re Best Products Co.,* 168 B.R. 35, 57 (Bankr.

S.D.N.Y. 1994) ("Fraudulent transfer laws are intended to promote payment to creditors"), *aff'd,*

68 F.3d 26 (2d Cir. 1995); *J.E. Jennings, Inc. v. William Carter Co. (In re J.E. Jennings, Inc.),*

46 B.R. 167, 169 (Bankr. E.D. Pa. 1985) ("the avoidance powers of the [Bankruptcy] Code are

intended for the benefit of the debtor's creditors.  Thus, the debtor-in-possession holds avoidance

powers in trust for the benefit of creditors . . . . Where no benefit to the estate will result, a

debtor-in-possession may not exercise the avoidance powers of a trustee;" citations omitted).

The language in Bankruptcy Code Section 550(a) allowing recovery "for the benefit of

the estate" has been uniformly construed -- where the debtor is not reorganizing -- to mean for

the benefit of creditors, not the debtor or its equity holders, *Wellman v. Wellman,* 933 F.2d 215,

217-18 (4th Cir. 1991) (avoidance action under §§ 548 and 550 cannot be maintained if the only

beneficiary is the debtor); *see Moore v. Bay (In re Sassard & Kimball, Inc.),* 284 U.S. 4 (1931) (under Bankruptcy Act, "what thus is recoverable for the benefit of the estate is to be distributed in 'dividends of an equal per centum … on all allowed claims, except such as have priority or are secured,'" quoting Bankruptcy Act § 65); *see also Dunes Hotel Assocs. v. Hyatt Corp.,* 245 B.R. 492, 499, 512 (D. S.C. 2000) (affirming summary judgment dismissing debtor's avoidance action under § 544(a)(3); "the Bankruptcy Code does not permit a debtor-in-possession to avoid an interest to provide a windfall for the debtor and its equity holder"); *Kennedy Inn Assocs. v. Perab Realty Corp. (In re Kennedy Inn Assocs.),* 221 B.R. 704, 714-15 (Bankr. S.D.N.Y. 1998) (§544(a)(3) avoidance only permitted to extent creditors will benefit).

Indeed, regardless of the underlying avoidance authority -- whether it be the Bankruptcy Code's sections 548, 544(a), or 544(b) and the underlying state fraudulent transfer laws -- the rule remains that such claims may only be brought to benefit creditors, *see, e.g., Wellman,* 933 F.2d at 217-18 (§§ 548 and 550); *Dunes Hotel,* 245 B.R. 492 (§§ 544(a)(3) and 550); *Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. Partner'p IV,* 229 F.3d 245, 250 (3d Cir. 2000) ("under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *Best Products,* 168 B.R. at 57 (avoidance per § 544(b) and recovery per § 550 "would be only for the benefit of creditors and the obligation would still stand ahead of equity"); *see also* Section 544(b) of the Bankruptcy Code ("the trustee may avoid any transfer … that is voidable under applicable law *by a creditor* holding an unsecured claim …;" emphasis added); *Wilcox v. Goess,* 22 F. Supp. 841, 843 (S.D.N.Y. 1938).

As the court in *Wilcox v. Goess* observed almost seventy years ago:

> Underlying all the statutes passed for the protection of creditors, there is what I might perhaps call a lowest common denominator necessary to found a cause of action; namely, that there must be a diminution of the assets of the estate available ratably to the general creditors. This is true whether the question be of a

> preference under the Bankruptcy Act, or a transfer in fraud of
> creditors under the Debtor and Creditor Law of New York state, …

22 F. Supp. at 843 (citations omitted).[6]

The reason for this creditor-benefit limitation again goes back to the purpose of

fraudulent transfer law:  "to prevent harm to creditors," *Murphy,* 331 B.R. at 124; *see Buncher,*

229 F.3d at 250 ("The purpose of fraudulent conveyance law is to make available to creditors

those assets of the debtor that are rightfully a part of the bankruptcy estate, …"); *The Official*

*Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),*

226 F.3d 237, 241 (3d Cir. 2000) ("fraudulent transfers claims have long belonged to a

transferor's *creditors*, whose efforts to collect their debts have essentially been thwarted as a

consequence of the transferor's actions, and that tradition continues today") (emphasis in

original); *McFarland v. Leyh (In re Texas Gen. Petroleum Corp.),* 52 F.3d 1330, 1336 (5th Cir.

1995) (noting general policy behind avoidance actions is that proceeds benefit creditors, not

debtors); *Newfield v. Ettlinger,* 22 Misc. 2d 769, 775, 194 N.Y.S.2d 670, 678 (Sup.Ct. N.Y.

County 1959) (there is no fraudulent conveyance where there is no diminution of value of assets

or estate available to creditors), *app. dismissed,* 10 A.D.2d 947, 205 N.Y.S.2d 908 (1st Dep't

1960); *Prudential Savings Bank v. Grant,* 99 N.Y.S.2d 602, 603 (Sup.Ct., N.Y. County 1950)

(transfer only fraudulent under DCL if assets available to creditors are diminished).

Thus, recognizing fraudulent transfers can only be avoided by or for creditors, it is well

settled that, absent a creditor's stake in an avoidance action, the transfers remain binding on the

---

[6]    In addition, for the claims brought under New York's DCL (Counts 3 through 6 in the Amended
Complaint), the statutory language itself restricts the beneficiaries to creditors.  *See* DCL § 273 ("Every conveyance
made … by a person who is … insolvent is fraudulent as to creditors …."); DCL § 274 ("Every conveyance made
without fair consideration when … the property remaining …is an unreasonably small capital, is fraudulent as to
creditors …."); DCL § 275 ("Every conveyance made …when the person … believes that he will incur debts beyond
his ability to pay …, is fraudulent as to both present and future creditors"); DCL § 276 ("Every conveyance made
…with actual intent, … to hinder, delay or defraud either present or future creditors, is fraudulent as to both present
and future creditors"); DCL § 276-a ("… where such conveyance is found to have been made … with actual intent,
… to hinder, delay or defraud either present or future creditors …"); DCL § 278 ("Where a conveyance … is
fraudulent as to a creditor, such creditor, …may …[h]ave the conveyance set aside …").

debtor, *see Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero Corp.),* 735 F.2d 740, 742 (2d Cir. 1984) ("To the extent that other creditors of [the debtor] are not affected adversely by enforcement of [the challenged] security interest, there is no reason why such interest should not be enforced"); *Murphy,* 331 B.R. at 126 ("Fraudulent conveyance statutes were not intended to protect transferors from their own generosity, stupidity or improvidence, and there is no federal bankruptcy interest in disrupting any legally binding state property relationships to the extent that ... creditors are not harmed under Section 548"); *Prudential Savings,* 99 N.Y.S.2d at 603 (conveyance to mortgagees not fraudulent where mortgages exceed value of property).  As Judge Brozman noted:

> Because the fraudulent transfer is voidable by creditors only, it is not remarkable that, as between the parties to the transfer, the law regards the transfer as real and binding.  "It was said in Coke's time, and it has been true ever since, that a gift made in fraud of the donor's creditors is good against the donor and his privies."

*Best Products,* 168 B.R. at 57, quoting 1 G. Glenn, *Fraudulent Conveyances and Preferences,* § 114 at 225 (1940).

Consequently, when the only beneficiaries of a fraudulent transfer action are the debtor and equity holders, the courts will dismiss the action.  *Wellman,* 933 F.2d at 218 (debtor not permitted to avoid transfer where recovery would only benefit debtor); *Whiteford Plastics,* 179 F.2d at 584 (same); *Dunes Hotel,* 245 B.R. at 511 (affirming dismissal of avoidance action where only beneficiaries were debtor and equity holder); *see Kennedy Inn,* 221 B.R. at 714-15 (if there is no benefit to creditors from avoidance action, debtor has no standing to sue); *In re Revco D.S., Inc.,* 118 B.R. 468, 474-75 (Bankr. N.D. Ohio 1990) (mandatory redeemable preferred stockholder was an equity holder, not a creditor, and thus lacked standing to bring fraudulent transfer claims under Michigan law); *Harbinger Capital Partners Master Fund I, Ltd. v. Granite*

*Broadcasting Corp.,* 906 A.2d 218, 225 (Del. Ch. 2006) (redeemable preferred stock holders are not creditors and thus lacked standing to bring fraudulent transfer claim under New York DCL)

> ### B.   Fraudulent Transfer Claims Can Only Be Brought
> ###       To the Extent Necessary To Satisfy Creditors' Claims

The Debtors cannot use fraudulent conveyance litigation to create a recovery for equity holders as the courts have uniformly limited any recovery on such litigation to the amount necessary to satisfy **creditors**. *Murphy,* 331 B.R. at 126 ("Given … Section 548's limited purpose as a fraudulent conveyance law, the trustee in this case has the right to avoid the transfer of the Property as fraudulent but *only to the extent necessary to satisfy allowed prepetition and administrative creditor claims;*" emphasis added); *see Travelers Ins. Co. v. 633 Third Associates,* 973 F.2d 82, 86 (2d Cir. 1992) (under DCL, "at least one New York appellate court has held under the UFCA 'creditors have causes of action only to the extent to which they have been damaged,'" quoting *A/S Kreditt-Finans v. Cia Venetico de Navegacion S.A.,* 560 F. Supp. 705, 711 (E.D. Pa. 1983), *aff'd,* 729 F.2d 1446 (3d Cir. 1984) (applying DCL) and *Buckley Petroleum Products, Inc. v. Goldman,* 28 A.D.2d 640, 641, 280 N.Y.S.2d 876, 878 (4th Dep't 1967); *see also Moore v. Bay,* 284 U.S. at 5 ("for the benefit of the estate" means distributions for all allowed claims); *Rodriguez v. Citibank, F.S.B. (In re Nowicki),* 202 B.R. 729, 736 (Bankr. N.D. Ill. 1996) (under Illinois UFTA "a fraudulent transfer may, at the instance of creditors, be deemed voidable, but only to the extent necessary to satisfy the claims of creditors")

In short, the legal premise for this motion is simple and clear:  the Debtors' fraudulent transfer claims can only be brought on behalf of creditors, and only to the extent necessary to satisfy such creditors' claims.  Since there are no creditors of these estates, there is no basis for pursuing the lawsuits.

**POINT II.**

**THE NON-REDEEMING INVESTORS IN THE
BAYOU FUNDS DO NOT QUALIFY AS CREDITORS ELIGIBLE
TO SUPPORT THE DEBTORS' FRAUDULENT TRANSFER CLAIMS**

As shown below, investors in the Bayou Hedge Funds do not qualify as "creditors" sufficient to support the plaintiffs' fraudulent transfer claims in these adversary proceedings.

To become a Bayou investor, each prospective investing entity or person was sent an operating agreement by one or more of the Bayou Hedge Funds, in substantively identical form (Neville Dec. Exhibit Y, hereinafter the "Operating Agreements").[7] While the substantive provisions of each of the Operating Agreements are identical on the relevant points herein, for the sake of order, citations will be to the Superfund Operating Agreement (Neville Dec. Ex. [X]). Each of the Bayou Hedge Funds is a Delaware limited liability company (or "LLC") (Neville Dec. ¶¶ 28-32 and Exhibits T-X; *see also* Amended Complaints, ¶ 7), governed by the Delaware Limited Liability Company Act, Delaware Code, title 6, chapter 18, §§ 18-101 - 1109 (the "Delaware LLC Law").  Investors in the Bayou Hedge Funds were "members" in such funds, both under the Delaware LLC Law and the Operating Agreements.  Delaware LLC Law §§ 18-101(11), 18-301 (LLC's operating agreement controls admission to membership); Superfund Op. Agreement § 1.1(t).

As shown below, as members of the one or more of the Bayou Hedge Funds, the Bayou investors were equity holders, under both the Delaware LLC Law and the pertinent agreements. Indeed, the controlling law and applicable contracts not only confirm the Bayou investors had

---

[7]     A copy of the Amended And Restated Operating Agreement of Bayou Superfund, L.L.C. -- A Delaware Limited Liability Company -- form dated 2/07/03 (the "Superfund Op. Agreement"); a copy of the Amended And Restated Operating Agreement of Bayou No Leverage Fund, L.L.C. -- A Delaware Limited Liability Company -- form dated 2/07/03; and a copy of the Amended And Restated Operating Agreement of Bayou Accredited Fund L.L.C. -- A Delaware Limited Liability Company -- form dated 2/07/03 -- are all attached as Neville Dec. Ex. Y.

the profit/loss risks and voting rights of equity holders, but also distinguish investors' rights and

protections from regular creditors.

      A.     As LLC Members Under the Delaware Law,
             Bayou Investors Were Equity Holders

     1.    Risk, Voting and Limited Liability of Equity Holders.  The Delaware LLC Law

authorizes an LLC to allocate among its members the LLC's profits, losses, cash and assets (§§

18-503, -504), allows LLC members to vote on management (§ 18-302), and provides for limited

member liability (§ 18-303 (no member liability for LLC debts)).  These are the classic rights of

equity holders, not creditors.

> In theory, the general creditor asserts a fixed dollar claim and
> leaves the variable profit to the stockholder; the stockholder takes
> the profit and provides a cushion of security for payment of the
> lender's fixed dollar claim.  The absolute priority rules reflects the
> different degree to which each party assumes a risk of enterprise
> insolvency; …

*Jezarian v. Raichle (In re Stirling Homex Corp.),*  579 F.2d 206, 214 (2d Cir. 1978) quoting

Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy -- Allocating the

Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors, 48

N.Y.U.L.Rev. 261, 286-87 (1973) ("Slain & Kripke").  *See Joshua Slocum, Ltd. v. Boyle (In re*

*Joshua Slocum, Ltd.),* 103 B.R. 610, 623 (Bankr. E.D. Pa.) ("Stockholders, as owners of an

enterprise, bear the risk of a company's financial failing and, conversely, receive the benefits of

success"), *aff'd,* 121 B.R. 442 (E.D. Pa. 1989); *Harbinger Capital Partners Master Fund I, Ltd.*

*v. Granite Broadcasting Corp.,* 906 A.2d 218, 225 (Del. Ch. 2006) (among other things, absence

of right to fixed payment amount rendered redeemable preferred stock holders equity not debt);

*see also Sender v. Johnson (In re Hedged-Investments Assocs., Inc.),* 84 F.3d 1267, 1272 (10th

Cir. 1996) (limited partner held equity interest, not claim of creditor, against debtor limited

partnership); *In re Revco D.S., Inc.,* 118 B.R. 468, 474-75 (Bankr. N.D. Ohio 1990) (mandatory

- 14 -

redeemable preferred stock was equity, not creditor, even though holder had right to redemption and claim of fraud in purchase of stock).

These are the same rights and protections afforded other classic equity holders, such as limited partners (Delaware Limited Partnerships Law, Del. Code tit. 6, §§ 17-503, -504; rights to profits, losses, cash and assets) and shareholders (Delaware Gen. Corp. Law, Code tit. 8, §§ 212 (voting)).  In addition, like corporate shareholders (Delaware Code, tit. 8, §§ 219(a), 220(b) and 327), and limited partners (Delaware Code, tit. 6, §§ 17 - 305 and 17 - 1001 to 1004), LLC members have statutory rights to bring derivative actions (Delaware LLC Law §§ 18 - 1001 to 1004), and to inspect certain of the LLC's books and records, including tax returns and member lists, Delaware LLC Law § 18 - 305(a).  Like shareholders of a corporation, members of an LLC generally are not liable to third parties for the debts, obligations and liabilities of the LLC. (Delaware LLC Law §18-303).  Thus, under Delaware law LLC members share the classic characteristics of other forms of equity.[8]

2.     <u>Members Lack the Rights of Creditors</u>.  Like most states' LLC laws, the Delaware LLC law carefully distinguishes between the rights of creditors to payment and the rights of members.  Not only does the LLC law in effect subordinate members' payment rights to those of general creditors, payments to members are prohibited if the assets remaining are insufficient to pay general creditors.  There is no prohibition against paying members, however, if the remaining assets are insufficient to cover the remaining members' capital accounts.  For example, members are prohibited from receiving distributions if the LLC's assets remaining thereafter do not exceed liabilities, *excluding liabilities for other members' interests,* Delaware

---

[8]     These common benefits of equity ownership are consistent with a stated purpose of the LLC form -- to combine the desirable characteristics of corporations, limited partnerships, and general partnerships.  *Great Lakes Chemical Corp. v. Monsanto Co.,* 96 F. Supp. 2d 376, 383 (D. Del. 2000); *see Addy v. Myers,* 616 N.W.2d 359, 362 (N.D. 2000) (describing general purpose of LLCs as combining a partnership's flow-through income tax advantages and capital structure with a corporation's limited liability and governance structure).

LLC Law § 18-607(a).[9]  It is only when a member knowingly receives a distribution while the

LLC's assets are insufficient to satisfy *non-member liabilities*, that the member is liable to the

LLC for that distribution, Delaware LLC Law § 18 - 607(b).  Similarly, upon dissolution,

creditors are to be paid in full before any distribution to members, Delaware LLC Law § 18 -

804.  This priority for creditors' debts over those of ownership is similar under Delaware law for

other forms of equity such as partners, limited partners and corporate shareholders, *see*

Delaware's partnership law (Del. Code tit. 6, § 15-807), limited partnership law (Del. Code tit. 6,

§ 17-804) and corporations law (Del. Code tit. 8, § 281(a)).

This seniority of creditors' recovery is also a bedrock principle of the "absolute priority"

rule in bankruptcy and corporate accounting, *Stirling Homex,* 579 F.2d at 211 (absolute priority

rule); *Joshua Slocum,* 103 B.R. at 623 (corporate accounting).  As the *Joshua Slocum* court

observed:

> the rights of shareholders to recover dividends or to redeem their
> stock is dependent on the financial solvency of a corporation.  …
>           … Their interest in a corporation is a residual interest,
> measured by the difference between the assets and the liabilities of
> a corporation. … Equity security holders do not receive
> distribution until after a debtor's creditors have been satisfied.

*Joshua Slocum,* 103 B.R. at 623.

Thus, even without considering the relevant agreements, under the Delaware LLC Law

members of the Bayou Hedge Funds are plain equity holders, with a distinct set of rights from

those of creditors.  *See L'Arbalete, Inc. v. Zaczac,* 474 F. Supp. 2d 1314, 1324 - 25 (S.D. Fla.

2007) (due, *inter alia,* to substantial risk of  losing entire amount, $1 million advanced for

---

[9]       Section 18-607(a) provides, in pertinent part:
          A limited liability company shall not make a distribution to a member to the
          extent that at the time of the distribution, after giving effect to the distribution,
          all liabilities of the limited liability company, *other than liabilities to members
          on account of their limited liability company interests* and liabilities for which
          the recourse of creditors is limited to specified property of the limited liability
          company, exceed the fair value of the assets of the limited liability company, ….
          (emphasis added)

"special member interest" in Delaware LLC was an equity investment, not a loan, under U.S. tax and Florida law, despite priority of promised return); *Mills v. Webster (In re Multimedia Communications Group Wireless Assocs. of Liberty County, Ga., L.C.),* 212 B.R. 1006, 1010 (Bankr. M.D. Fla. 1997) (investors/members of Georgia LLC were not creditors for purposed of § 544(b) of the Bankruptcy Code, citing court's prior ruling).

  B.  Under the Controlling Agreements
     Investors in The Bayou Funds Were Equity Holders

  Under the Delaware LLC Law, "limited liability company agreement" means "any agreement (whether referred to as a limited liability company agreement, operating agreement or otherwise), written or oral, of the member or members as to the affairs of a limited liability company and the conduct of its business." Section 18-101(7). Furthermore, "A member … of a limited liability company … is bound by the limited liability company agreement whether or not the member … executes the limited liability company agreement." (*Id.*) In this case, the primary agreement used by the Plaintiff Funds within this category was the Operating Agreement.

  1.  Contractual Rights of Equity Holders. Under the Operating Agreements, the Plaintiff Funds were each pooled investment funds (hedge funds), with broad authority to pursue a variety of investments, and in which members invested to share proportionate rights in any gains and losses, and with certain rights to vote for management. Specifically, the Funds were authorized to buy, sell and otherwise trade in virtually all forms of securities, commodities and other financial instruments (Superfund Op. Agreement, article 3). Each member held a "Membership Interest" in the fund which included both an "Economic Interest" (basically, a proportionate share of the fund's profits and losses, *see* Superfund Op. Agreement § 1.1(k)) and certain voting rights to elect or remove managers of the fund, or vote at members' meetings (Superfund Op. Agreement §§ 1.1(u), 5.2, 5.10, 7.1 - 7.10).

- 17 -

The "Economic Interest" segment of a member's interest included a "Capital Account" which represented the capital initially contributed by the member (Capital Contribution), for investment purposes, as thereafter increased (*e.g.,* by additional contributions and gains) and/or decreased (*e.g.,* by distributions, losses and withdrawals) (Superfund Op. Agreement §§ 1.1(e), (f), (k), 8.3, 10.1 and 14.16(a)(ii)).[10]  Members were given no guarantee of any return on their investment, and expressly acknowledged the possibility of deficits and the loss of the invested capital (Superfund Op. Agreement §§ 1.1(i), 5.4).  Thus, as true equity holders, members' returns were dependent on the applicable Bayou Hedge Fund's earnings, without any promise of fixed amount or date for payment.

2.    Contractual Rights and Liabilities *Vis a Vis* Creditors and Other Members.  Like the LLC statute, the Bayou Operating Agreements contain numerous provisions which work to the benefit of creditors (but not other members), including those provisions which  "subordinate" members' rights and interests to creditors' recovery.   Section 10.1 of the Operating Agreement permits withdrawals from a member's capital account up to three times a year, provided either "(i) all liabilities of the Company have been paid, or (ii) the Company has sufficient assets to pay such liabilities (including contingent or unliquidated liabilities)."[11]  In Section 13.2, entitled "Winding Up, Liquidation, and Distribution of Assets" upon dissolution, the manager is directed *first* to liquidate all assets, *second* to allocate any profit or loss, *third* to discharge liabilities "other than liabilities to Members … for distributions," and establish Reserves for contingencies

---

[10]    For purposes of the motions to dismiss, the Court was constrained to accept the allegations in the Amended Complaints that capital accounts of the redeeming investors were inflated.  However, the Debtors relied on general statements about the Debtors' finances in formulating those complaints and they have not done an analysis of the Defendants' capital accounts at the times of the redemption.
[11]    As evidenced by Section 13.2(c) of the Operating Agreement "unliquidated and contingent liabilities" refers to liabilities other than to members.

and liabilities,[12] and *finally,* distribute any remaining assets to the members.  (Superfund Op. Agreement § 13.2; Neville Dec. Exhibit Y).  The plain language of the third and fourth steps here make explicit the subordination of members to creditors' payment.  This is consistent with the creditor priority required under Delaware LLC Law (§ 18-804), and as mentioned above parallels provisions for creditors-before-owners distributions for other business entities (*see* Delaware's corporations law (Del. Code tit. 8, § 281(a)), partnership law (Del. Code tit. 6, § 15-807), and limited partnership law (Del. Code tit. 6, § 17-804)).

The Operating Agreements restrict the rights of one member to look to another member for a recovery on any shortfall in a distribution.  Section 9.4, for example, prohibits member distributions unless there are sufficient assets remaining to cover regular creditors, *but allows distributions to members where the remaining assets are insufficient to cover the remaining members' capital accounts*:

> No distribution shall be declared and paid unless, after distribution is made, the assets of the Company are in excess of all liabilities of the Company, *except liabilities to Members and Economic Interest Owners on account of their contributions.*

Superfund Op. Agreement § 9.4 (emphasis added).   Under the Operating Agreement, once general creditors are paid under a dissolution, members who have not received repayment of their capital contributions are barred from bringing any form of claim against other members or former members.  (Superfund Op. Agreement § 13.4: "If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contribution of one or more Members or Economic Interest Owners, such Persons shall have no recourse against any other Member or Economic Interest Owner.")

---

[12]     "Reserves" (used above in § 13.2) are defined as funds set aside to pay various categories of regular creditors (i.e., "taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Company's business"), not members (§ 1.1(aa)).

C.     The Relevant Precedent Compels The Conclusion That
       Investors' Membership Status Is Equivalent to Corporate Shareholders

The above-cited terms of the investors' membership interests in the Bayou Hedge Funds -
- including the proportionate share of profits and losses, lack of fixed returns or security, risk of
investment loss, limited liability, limited voting rights as to management and subordination to
creditors' payments -- make clear those investments were equity interests, not the claims of
creditors.  *L'Arbalete,* 474 F. Supp. 2d at 1324 - 26 (substantial risk of losing entire amount
meant $1 million advance to Delaware LLC was equity investment under federal tax and Florida
laws, despite priority of promised return); *Multimedia Communications,* 212 B.R. at 1010
(investors/members of Georgia LLC were not creditors for purposed of § 544(b) of the
Bankruptcy Code, citing court's prior ruling); *see Harbinger Capital,* 906 A.2d at 225 (among
other things, absence of right to fixed payment amount rendered redeemable preferred stock
holders more akin to equity than debt, such that holders lacked standing to bring fraudulent
transfer claim under New York DCL); *see also Sender v. Johnson (In re Hedged-Investments
Assocs., Inc.),* 84 F.3d 1267, 1272 (10th Cir. 1996) (limited partner held equity interest, not claim
of creditor, against debtor limited partnership); *Revco,* 118 B.R. at 474-75 (mandatory
redeemable preferred stock was equity, not creditor, even though holder had right to redemption
and claim of fraud in purchase of stock); *Joshua Slocum,* 103 B.R. at 623; *cf. Allied Capital
Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1031 n. 17 (Del. Ch. 2006) (unlike
stockholders, debtholders have no voting rights unless provided in certificate of incorporation).
There is no reasonable dispute that the Bayou investors' interests as members are equity.

Consequently, the Bayou Hedge Fund investors -- by virtue of their interests in Funds --
can only be properly characterized as equity holders, who cannot confer standing sufficient to
support the fraudulent transfer claims here.

## POINT III.

### ALL CLAIMS BY BAYOU INVESTORS TO RECOVER FOR LOSSES IN THEIR INVESTMENTS MUST BE TREATED AS EQUAL OR SUBORDINATE TO EQUITY INTERESTS PURSUANT TO 11 U.S.C. § 510(b), AND CANNOT SUPPORT FRAUDULENT TRANSFER CLAIMS

The fact that certain of the non-redeeming investors characterize themselves as creditors and all the non-redeeming investors filed proofs of claim in these cases does not elevate their interests to that of creditors.  Fewer than half of the investors filed proofs of claim asserting fraud as the basis of the claims.   The remainder of the investors filed proofs of claim for their equity investments.  Those that did file fraud claims, set the damages, for the most part, either at the exact amount of their capital contributions in the Bayou Hedge Funds or in the amount of the closing balance of their capital accounts stated by Bayou.  *See* Neville Dec. ¶ 17.  The investor fraud claims, which cover a variety of wrongs relating to the investments in Bayou Hedge Funds, all fall squarely within the purview of section 510(b) of the Bankruptcy Code, and thus must be treated on par with equity for recovery purposes.

Section 510(b) of the Code provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

As shown below, consistent with section 510(b)'s goal of subordinating to general creditors' claims *any* claim by investors for the loss of their investment, the controlling precedent requires such subordination regardless of the theories, wrongdoing or damage alleged by the investors.

The consequence of treating the investor claims on a par with investor interests is that holders do not qualify as legitimate beneficiaries of fraudulent transfer actions.[13]

A.    The Purpose of Section 510(b)

The courts have recognized Congress' purpose in passing section 510(b) was to prevent equity holders from elevating their interests to the status of creditors and then recovering as a creditors by bringing claims relating to their investments.

> Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding. … More important than the timing of the actionable conduct, from a policy standpoint, is the fact that the claims in this case seek to recover a portion of claimants' equity investment.

*Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.),* 281 F.3d 133, 142 (3d Cir. 2002) (stockholders' contract claim, that debtor failed post-purchase to use best efforts to register stock, subordinated per § 510(b)); *In re Enron Corp.*, 341 B.R. 141, 158 (Bankr. S.D.N.Y. 2006); *see In re Alta+Cast, LLC*, 301 B.R. 150, 154-55 (Bankr. D. Del. 2003) ("Section 510(b) prevents disappointed shareholders from recovering their investment by asserting claims for damages on parity with general unsecured creditors") (citation omitted);  *see also Washington Bancorporation v. F.D.I.C. (In re Washington Bancorporation*), 1996 WL 148533, 1996 U.S.Dist. LEXIS 3876, at *19 (D. D.C. March 19, 1996) ("When an equity holder seeks to raise an equitable claim to the status of a general unsecured creditor by alleging a tort claim based upon the purchase of a security, section 510(b) requires that the tort claim be subordinated to all other general unsecured claims.  Section 510(b) prevents a security holder from 'bootstrapping' an equity interest (subordinate to the claims of general unsecured claims) to

---

[13]    There can be no reasonable debate that the Bayou investors' Membership Interests, as defined and provided in the Operating Agreements, are "securities" within the meaning of the Bankruptcy Code, 11 U.S.C. § 101(49)(A)(xii).  *See* Superfund Op. Agreement §§ 1.1 generally, and (k) and (u), 3.1, 9.1 and 14.16, Neville Dec. Ex. Y; *see In re Alta+Cast, LLC,* 301 B.R. 150, 154 - 55 (Bankr. D. Del. 2003) (membership interest in LLC is a security within § 510(b)).

a general unsecured creditor status simply by alleging fraud, rescission or some other tort theory

on the sale of the security") (citations omitted).

Thus, the controlling policy behind application of section 510(b) is not the theory or

timing of wrongdoing equity holders might allege, but rather whether the claim was for a loss in

their *investment. Telegroup,* 281 F.3d at 141-42; *Alta+Cast,* 301 B.R. at 154; *In re Granite*

*Partners, L.P.,* 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997) (Congress' concern in passing section

510(b), adopting the views expressed in the legal commentary of Slain & Kripke, was with

stockholders' efforts to recapture their investment, not with the theory employed or wrongdoing

alleged).

Indeed, even before the passage of section 510(b), the Second Circuit had established a

bar against defrauded equity holders recovering their investment losses *pari passu* with creditors:

> We will not allow stockholders whose claims are based solely on
> the alleged fraud that took place in the issuance of stock to deplete
> further the already meager pool of assets presently available to the
> general creditors. "When a corporation becomes bankrupt, the
> temptation to lay aside the garb of a stockholder, on one pretense
> or another, and to assume the role of a creditor, is very strong, and
> all attempts of that kind should be viewed with suspicion." "As a
> general rule equity prefers the claims of innocent general creditors
> over the claims of shareholders or subordinated creditors deceived
> by officers of the corporation."

*Jezarian v. Raichle (In re Stirling Homex Corp.),* 579 F.2d 206, 213 (2d Cir. 1978), quoting

*Newton Nat'l Bank v. Newbegin*, 74 F. 135, 140 (8th Cir. 1896) and *F.D.I.C. v. American Bank*

*Trust Shares, Inc.,* 412 F. Supp. 302, 308 (D. S.C. 1976), *vacated on other grounds,* 558 F.2d

711 (4th Cir. 1977); *see Granite Partners,* 208 B.R. at 337 (noting *Stirling Homex* reliance on

Slain & Kripke analysis).

In short, section 510(b) was passed to embody the judicial principle that any claim of

equity holders to recover investment losses -- regardless of the theory or wrongdoing alleged --

must remain on a par with equity and may not be elevated to the level of creditors' claims.

B.        Irrelevance of the Legal Theory or Time of Misconduct

In order to carry out this Congressional intent, the courts have construed section 510(b)

broadly.  Thus, while section 510(b) expressly subordinates rescission and damages claims

"arising from the purchase or sale" of an equity holder's security (which includes the claims of

certain Bayou investors), it is now well-settled this section applies to every equity holder's claim

of investment loss, including "fraudulent maintenance" claims (post-investment concealment of

initial fraud); "fraudulent retention" claims (misrepresentation of post-investment matters

inducing retention of shares); and even the failure to issue the stock at all.  *See Rombro v.*

*Dufrayne (In re Medical Diversified, Inc.)*, 461 F.3d 251 (2d Cir. 2006) (affirming subordination

of executive's claim that debtor breached agreement to issue stock; adopting the view that

section 510(b) must be interpreted as broad in scope to carry out the legislative purpose

underlying the section); *In re Geneva Steel Co*., 281 F.3d 1173 (10th Cir. 2002) (subordinating a

post-investment fraudulent retention  claim); *Telegroup,* 281 F.3d at 144 n.2 (subject to

underlying policies, section 510(b) covers any shareholder claim related to investment loss);

*Enron*, 341 B.R. at 163 (section 510(b) applies to claim that debtor failed to deliver stock,

regardless of underlying theory); *In re WorldCom Inc*., 329 B.R. 10, 15-16 (Bankr. S.D.N.Y.

2005) ("From the perspective of Section 510(b), it makes no difference whether the

stockholder's loss in the value of his stock was caused by a pre-purchase fraud which induced his

purchase, or a post-purchase fraud, embezzlement, looting, or other corporate misconduct which

undermined the value of his stock"); *Weissmann v. Pre-Press Graphics, Co.* (*In re Pre-Press*

*Graphics Co.),* 307 B.R. 65 (N.D. Ill 2004) (subordination of judgment claim based on theories

of corporate oppression and fiduciary duty; injury stemmed from dilution of equity interest from

post-investment issuance of additional stock); *Granite Partners,* 208 B.R. 332 (ordering section

510(b) subordination of equity holders' fraudulent maintenance and fraudulent retention claims,

alleging wrongdoing over an extended period of time).  Consequently, under the universally

accepted broad construction warranted for the statute, section 510(b) extends to virtually any

claim for wrongdoing causing an investment loss, whether the misconduct was pre-investment or

post-investment, or even if the investment never happened at all, *Medical Diversified,* 461 F.3d

251; *Enron Corp.*, 341 B.R. at 163; see *Telegroup,* 281 F.3d at 144 n.2.

Not surprisingly, therefore, despite some earlier confusion in the case law, it is now well

settled that section 510(b) is applicable regardless of the equity holders' underlying legal theory,

including both tort and contract theories.  *E.g., Medical Diversified,* 461 F.3d 251 (subordinating

executive's contract claim); *Enron Corp.*, 341 B.R. at 161 - 62 (section 510(b) applies to both

tort and contract claims); *Vista Eyecare, Inc. v. Neumann (In re Vista Eyecare, Inc.*), 283 B.R.

613, 626-27 (Bankr. N.D. Ga. 2002) (same); *see also Anchorage Police & Fire Ret. Sys. v.

Official Committee of Holding Company Debtors (In re Conseco, Inc.),* 2004 WL 1459270, 2004

U.S. Dist. LEXIS 11734 (N.D. Ill. June 25, 2004) (section 510(b) covers fraud claims); *Pippin v.

Kaiser Group Int'l, Inc. (In re Kaiser Group Int'l, Inc.),* 2001 WL 34368405, 2004 U.S. Dist.

LEXIS 25574 at *4 (D. Del. November 29, 2001) ("Appellants also suggest that their claims are

not subject to Section 510(b), because their claims are contract claims and not tort claims.

However, Section 510(b) contains no restrictions limiting its application to certain types of

claims, and the Court declines to read such a restriction into the express language of Section

510(b)").

In *Telegroup,* 281 F.3d 133, for example, the Third Circuit construed section 510(b) to

subordinate claims filed by shareholders seeking damages for breach of contract for the debtor's

failure to use its best efforts to register their stock: "we see no reason as a matter of policy why a

fraud claim against Telegroup for misrepresenting to buyers that it was using its best efforts to

register stock should be subordinated under §510(b), but a contract claim against Telegroup for

breaching its agreement to use its best efforts to register its stock should not," 281 F.3d at 143,

*citing In re International Wireless Communications Holdings, Inc*., 257 B.R. 739, 746 (Bankr. D.

Del. 2001) ("Many claims of 'defrauded' shareholders could be characterized as either [contract

or tort claims]. Were we to limit the applicability of section 510(b) to tort claims, shareholders

could easily avoid its effect by asserting that a debtor's fraudulent conduct in the sale of its

securities was a breach of the sales contract"), *aff'd,* 279 B.R. 463 (D. Del. 2002), *aff'd,* 68 Fed.

Appx. 275 (3d Cir. April 16, 2003).

The statute also extends to claims for any category of investment loss, regardless of size

and without any limitation to the "normal" risks assumed by equity investors.  Thus, in

*WorldCom* Merck argued its claim for damages should not be subordinated because WorldCom

was a massive fraud, outside the dimensions of risks assumed by shareholders upon which the

statute was purportedly predicated, 329 B.R. at 12 - 13.  This Court held section 510(b) is broad

enough to cover all fraud situations:

> The statute, however, does not discriminate between great frauds
> like WorldCom, which caused major damages to large and
> sophisticated investors like Merck, and petty swindles involving
> little companies which cause small investors to lose small amounts
> (or, perhaps, their pensions or life savings).  The statute applies
> evenhandedly to swindles both great and small leading to claims
> for rescission or damages by investors both great and small.  In the
> unlikely event that "colossal" frauds ought to be treated different
> from ordinary frauds, it will be for Congress to so provide, not the
> courts.

*WorldCom*, 329 B.R. at 13.

In these cases, less than half the filed proofs of claim refer to fraud.  It is undisputed that

the investors had the right to pursue legal remedies for fraudulent misrepresentation, inducement,

retention, etc. against the Bayou Hedge Funds, once the bankruptcy cases were filed, those

"claims" are subject to Section 510(b) whether they existed as a right to enforce or were litigated

and reduced to judgment.  *See Weissman v. Pre-Press Graphics Co. (In re Pre-Press Graphics*

*Co.)*, 307 B.R. 65 (N.D. Ill. 2004) (subordination of equity of claim based on Illinois state

judgment); *American Broad Sys. v. Nugent (In re Betacom of Phoenix)*, 240 F.3d 823 (9th Cir.

2001) (subordination of claims in federal litigation).  However, whether fraud is asserted or not,

all the Bayou investor claims are inextricably linked to the purchase and retention of their equity

investment (by date of purchase, amount of investment, alleged value of the investment over

time, etc.) and thus, all the investor claims, however framed, fall within the broad reach of

section 510(b).

      C.    <u>Investment Intermediaries' Losses</u>

      The reach of section 510(b) is not limited to investors' claims; the statute covers the

claims of the investment intermediaries as well.  The section by its express terms also covers

claims for reimbursement or contribution on account of a claim arising for rescission or damages

from the purchase or sale of a security.  Section 510(b) has been interpreted to cover liability and

defense costs asserted by third parties named or otherwise involved in litigation with respect to a

debtor's securities like the claims of the investment intermediaries in these cases.  *See Official*

*Committee of Creditors Holding Unsecured Claims v. PaineWebber, Inc. (In re De Laurentiis*

*Entertainment Group, Inc.),* 124 B.R. 305 (C.D. Cal. 1991) (subordinating stockbroker's claim

for reimbursement of attorneys' fees incurred defending suit based on debtor's public stock

offering); *In re Jacom Computer Services, Inc*., 280 B.R. 570 (Bankr. S.D.N.Y. 2002)

(subordinating underwriter's indemnification claim for costs incurred in shareholders class action

lawsuit);  *In re Mid-American Waste Systems, Inc*., 228 B.R. 816, 824-29 (Bankr. D. Del. 1999)

(subordinating officers', directors' and underwriter's indemnification claims for shareholder

litigation expenses); *In re Walnut Equipment Leasing Co.*, 1999 WL 1271762, 1999 Bankr.

LEXIS 1626 (Bankr. E.D. Pa. Dec. 28, 1999) (subordinating underwriter's indemnification claim

for costs of defending securities-fraud actions brought by the creditors committee and shareholder class).

In this case, the investment intermediaries each filed claims for damages and costs arising from their advice to their clients to invest in a Bayou Hedge Fund based upon Bayou's misrepresentations about the Bayou Hedge Fund's assets and performance, the investigation of the fraud and/or lawsuits filed against their client to recover the redemption payments.  As is evident from the cases cited above, section 510(b) is sufficiently broad to extend to and subordinate the claims asserted by the investment intermediaries.

D.     Subordination Here Requires Dismissal of the Debtors' Cases

Subordination of investor claims under section 510(b) has profound implications for the holders in all aspects of an insolvent, liquidating chapter 11 case, like the cases of the Bayou Hedge Funds.  The first clear, direct effect of subordination to the level of equity holder in an insolvent estate is disallowance of the claim -- no distribution or recovery.  *See, e.g., Carrieri v. Jobs.Com Inc.*, 393 F.3d 508, 528 (5th Cir. 2004) (subordinated claims relating to stock repurchase rights are disallowed and extinguished by the plan; "equity security holders … are not entitled to participate as meaningfully in a bankruptcy case as do claim holders"); *Geneva Steel,* 281 F.3d 1173 (investor's fraudulent-retention claim subordinated and received no distribution under plan); *Shakelford v. Metricom, Inc.,* 2006 WL 2724149, (N.D. Cal. Sept. 22, 2006) (section 510(b) claims disallowed when no recovery for equity under the plan); *WorldCom*, 329 B.R. at 11 - 12 (objection to claim under section 510(b) sustained; no recovery as an equity holder under the plan); *In re Enron Corp.*, 352 B.R. 363, 366 (Bankr. S.D.N.Y. 2006) ("As a practical matter, the subordination of a claim may result in the claim being effectively disallowed, as such claims rarely participate in the distribution"); *Walnut Equipment*, 1999 WL

1271762, 1999 Bankr. LEXIS 1626 (after subordination of underwriter's indemnification claims,

disallowance moot because plan provided no distributions to subordinated claims).

Moreover, the above authorities make it obvious Debtors cannot use avoidance powers

for the benefit of or on behalf of equity holders (*see* discussion in Point I above) or equity

holders holding section 510(b) subordinated claims.  In the only case uncovered by our research

to squarely address the issue of whether a section 510(b) claim would satisfy the standing

requirement for prosecution of fraudulent conveyance claims, the court in *In re Revco D.S., Inc.*,

118 B.R. 468 (Bankr. N.D. Ohio 1990) rejected the argument by a preferred shareholder as

follows:

> New York Life's argument that it is a subordinated creditor of both
> Anac and Revco by reason of its claims for fraud in connection
> with the purchase of the Preferred Stock is unfounded and will not
> confer "creditor" status on New York Life. Pursuant to 11 U.S.C. §
> 510(b) any claim of New York Life regarding the purchase of its
> Preferred Stock would not rise above the level of an equity interest
> of the Preferred Stock.  This Court concludes that New York Life
> is not a "creditor" of Revco or Anac, but rather an equity holder
> and therefore has no standing to prosecute a state fraudulent
> conveyance action.

118 B.R. at 474.

Section 510(b) is not strictly limited to claims allowance for plan distribution purposes.

Subordination of the claim to the level of an equity holder in an insolvent estate properly

terminates other litigation efforts where to proceed would be futile or improper because the

equity holders, holding claims subordinated to equity would not be entitled to a recovery.  *See*

*Levine v. R.T.C. (In re Coronet Capital Co.)*, 1995 WL 429494, 1995 U.S. Dist. LEXIS 10175

(S.D.N.Y. July 20, 1995) (complaint by noteholders against the banks to reform notes, declare

contractual subordination void or rescission of notes dismissed, for among other reasons, section

510(b) would subordinate their claims); *In re Bicoastal Corp.,* 133 B.R. 252 (Bankr. M.D. Fla.

1991) (motion to certify plaintiff class of shareholders with claims for misrepresentation; motion

denied because any resulting claim would be subject to section 510(b) subordination); *In re Cincinnati Microwave Inc.*, 210 B.R. 130 (Bankr. S.D. Ohio 1997) (settlement of class action lawsuit by shareholders for a general unsecured claim of $600,000 not approved under Rule 9019 because claims under section 510(b) not entitled to a distribution from the estate.)

In addition, application of section 510(b) may also alter the participation of the investor claimant throughout a chapter 11 case. Subordinated claims held by existing equity are treated as equity for purposes of committee formation, for example. *See In re Mercury Finance Co.*, 240 B.R. 270 (N.D. Ill. 1999) (appropriate to appoint equity holders asserting fraud claims to an equity committee).

Although the defrauded investors undeniably had claims for rescission or damages prior to the filing of the bankruptcy cases, the filing of the bankruptcy cases and application of section 510(b) bars the Debtors from using the avoidance powers of the Code or state law for the benefit of its equity holders.

## **CONCLUSION**

For all the foregoing reasons, the Sonnenschein Defendants respectfully request that the Court grant their motion for summary judgment dismissing the adversary proceedings in their entirety and with prejudice.

Dated: New York, New York
           May 15, 2007

SONNENSCHEIN NATH & ROSENTHAL LLP


By: ___/s/ Carole Neville_____
           Carole Neville (CN 5733)
           Arthur H. Ruegger (AR 8329)
           1221 Avenue of the Americas, 24th Floor
           New York, New York 10020
           Tel:    (212) 768-6700
           Fax:    (212) 768-6800

*Counsel to Sonnenschein Defendants*

## SCHEDULE A

---

BAYOU ACCREDITED FUND, LLC,                    Adv. Proc. No. 06-08318 (ASH)

                    Plaintiff,

        -against-

REDWOOD GROWTH PARTNERS, L.P.,

                   Defendant.

---

BAYOU SUPERFUND, LLC,                    Adv. Proc. No. 06-08321 (ASH)

                    Plaintiff,

        -against-

D. CANALE BEVERAGES, INC.,

                   Defendant.

---

BAYOU NO LEVERAGE FUND, LLC,                    Adv. Proc. No. 06-08329 (ASH)

                    Plaintiff,

        -against-

FRED MONTESI IRA and FRED MONTESI,

                  Defendants.

---

BAYOU SUPERFUND, LLC,                    Adv. Proc. No. 06-08332 (ASH)

                    Plaintiff,

        -against-

HELEN YULMAN REVOCABLE TRUST,

                   Defendant.

---

---

BAYOU SUPERFUND, LLC,                          Adv. Proc. No. 06-08333 (ASH)

                          Plaintiff,

            -against-

HERITAGE HEDGED EQUITY FUND LP,

                          Defendant.

---

BAYOU SUPERFUND, LLC,                          Adv. Proc. No. 06-08336 (ASH)

                          Plaintiff,

            -against-

JOHN D. CANALE III,

                          Defendant.

---

BAYOU SUPERFUND, LLC,                          Adv. Proc. No. 06-08337 (ASH)

                          Plaintiff,

            -against-

KFI CAPITAL PARTNERS LLC,

                          Defendant.

---

BAYOU SUPERFUND, LLC,                          Adv. Proc. No. 06-08338 (ASH)

                          Plaintiff,

            -against-

MARY P. SMYTHE RESIDUARY TRUST,

                          Defendant.

---

**SONNENSCHEIN SCHEDULE A, PAGE 2 OF 6**
9993345\V-1

BAYOU NO LEVERAGE FUND, LLC,                      Adv. Proc. No. 06-08340 (ASH)

                              Plaintiff,

              -against-

MAYER AND MORRIS KAPLAN FOUNDATION,

                              Defendant.

BAYOU SUPERFUND, LLC,                             Adv. Proc. No. 06-08341 (ASH)

                              Plaintiff,

              -against-

YK INVESTMENT PARTNERSHIP II,

                              Defendant.

BAYOU SUPERFUND, LLC,                             Adv. Proc. No. 06-08368 (ASH)

                              Plaintiff,

              -against-

MARVIN E. BRUCE LIVING TRUST,

                              Defendant.

BAYOU SUPERFUND, LLC,                             Adv. Proc. No. 06-08371 (ASH)

                              Plaintiff,

              -against-

SINGER 1995 FAMILY TRUST,

                              Defendant.

BAYOU SUPERFUND, LLC,                                    Adv. Proc. No. 06-08389 (ASH)

                    Plaintiff,

      -against-

RANDALL M. ROTHSTEIN and SHERYL B.
ROTHSTEIN,

                    Defendants.

---

BAYOU ACCREDITED FUND, LLC,                              Adv. Proc. No. 06-08401 (ASH)

                    Plaintiff,

      -against-

STEVEN R. SELCER,

                    Defendant.

---

BAYOU ACCREDITED FUND, LLC,                              Adv. Proc. No. 06-08403 (ASH)

                    Plaintiff,

      -against-

MADISON CAPITAL ADVISORS LTD.

                    Defendant.

---

BAYOU ACCREDITED FUND, LLC,                              Adv. Proc. No. 06-08411 (ASH)

                    Plaintiff,

      -against-

CICONIA & CO., LLC,

                    Defendant.

---

---

BAYOU SUPERFUND, LLC,                                    Adv. Proc. No. 06-08420 (ASH)

                                    Plaintiff,

            -against-

MYRNA BENNETT,

                                    Defendant.

---

BAYOU SUPERFUND, LLC,                                    Adv. Proc. No. 06-08422 (ASH)

                                    Plaintiff,

            -against-

H & B HEDGE FUND II LLC,

                                    Defendant.

---

BAYOU NO LEVERAGE FUND, LLC,                             Adv. Proc. No. 06-08423 (ASH)

                                    Plaintiff,

            -against-

MARC FLEISHER IRA and MARC FLEISHER,

                                    Defendant.

---

BAYOU SUPERFUND, LLC,                                    Adv. Proc. No. 06-08431 (ASH)

                                    Plaintiff,

            -against-

KEVIN BASS,

                                    Defendant.

---

**SONNENSCHEIN SCHEDULE A, PAGE 5 OF 6**
9993345\V-1

BAYOU SUPERFUND, LLC,                               Adv. Proc. No. 06-08435 (ASH)

                     Plaintiff,

        -against-

MICHAEL DAVIDSON,

                     Defendant.

---

BAYOU NO LEVERAGE FUND, LLC,                        Adv. Proc. No. 07-08244 (ASH)

                     Plaintiff,

        -against-

JOHN BARR III IRA and JOHN BARR III,

                     Defendants.

---